**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| BAITUL JAVID, BENJAMIN MEREDITH, ROBERT MURRAY and TINA PARSLEY HUGHES, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FINASTRA TECHNOLOGY, INC.,<br><br>Defendant. | Case No.: 6:25-cv-1284-PGB-DCI<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiffs Baitul Javid, Benjamin Meredith, Robert Murray and Tina Parsley Hughes ("Plaintiffs"), individually and on behalf of all others similarly situated ("Class Members"), bring this Consolidated Class Action Complaint against Defendant Finastra Technology, Inc. ("Defendant"), alleging as follows:

## I. INTRODUCTION

1. Plaintiffs bring this class action lawsuit on behalf of all persons who entrusted Defendant with sensitive personally identifiable information ("PII") that was stolen by criminal hackers in a foreseeable, preventable data breach.

2. From late October through early November, 2024, criminal hackers accessed Defendant's network systems and stole Plaintiffs' and Class Members' sensitive and confidential PII stored therein, including their full names, dates of birth, Social Security numbers, financial account numbers, and other sensitive data (collectively, "Private Information"), causing widespread injuries to Plaintiffs and Class Members (the "Data Breach").

3. Shortly after the Data Breach, the criminal threat actor known as "abyss0" posted the Private Information stolen from Defendant's systems in the Data Breach for sale on the dark web. Plaintiffs have all suffered identity theft and other injuries and damages due to the Data Breach and consequential misuse of their Private Information.

4. Defendant is a financial software company that offers a broad range of software and services for retail banking, lending, payments, treasury and capital markets, universal banking, and other financial services.

5. As part of its business and for profit, Defendant obtained, stored, processed, and used Plaintiffs' and Class Members' Private Information. Defendant benefited substantially from Plaintiffs' and Class Members' Private Information and could not perform its operations or provide the services it does without collecting and using that data.

6. In obtaining, possessing, controlling, and benefitting from Plaintiffs' and Class Members' Private Information, Defendant assumed a duty to securely store and protect it.

7. Financial services businesses that handle patients' Private Information (like Defendant) owe the individuals to whom the information relates a duty to adopt reasonable measures to protect it from disclosure to unauthorized third parties, and to keep it safe and confidential. This duty arises under contract, statutory and common law, industry standards, representations made to Plaintiffs and Class Members, and because it is foreseeable that the exposure of Private Information to unauthorized persons—especially hackers with nefarious intentions—will harm the affected individuals, including but not limited to the invasion of their private financial matters.

8. Defendant breached these duties and betrayed Plaintiffs' and Class Members' trust by failing to properly safeguard and protect their Private Information, thus causing and allowing cybercriminals to target, access, acquire, and misuse that sensitive data through the Data Breach.

9. The mechanism of the cyberattack and potential for improper disclosure of Private Information was or should have been a known risk to Defendant, and thus, Defendant knew failing to take reasonable steps to secure Plaintiffs' and Class Members' Private Information left it in a dangerous condition.

10. Defendant failed to adequately protect Plaintiffs' and Class Members' Private Information, and failed to even encrypt or redact this highly sensitive data. This unencrypted, unredacted Private Information was compromised due to Defendant's negligent acts and omissions and its utter disregard for Plaintiffs' and Class Members' privacy.

11. Defendant breached its duties to Plaintiffs and Class Members by failing to safeguard the Private Information it collected and maintained, including by failing to implement industry-standard data security preventing unauthorized access, to protect Private Information once unauthorized access occurred, or to detect and stop the Data Breach until over a week after it began. These failures caused and allowed criminal hackers to access and steal tens of thousands of individuals' Private Information from Defendant's care.

12. The harm resulting from a cyberattack like this Data Breach manifests in numerous ways including identity theft and financial fraud, and the exposure of an individual's Private Information due to a breach ensures that the individual will be at a substantially increased and certainly impending risk of identity theft crimes, potentially for the rest of his or her life. Mitigating that risk, to the extent even possible, requires significant time and money on prophylactic measures.

13. Hackers targeted and obtained Plaintiffs' and Class Members' Private Information from Defendant's systems because of the data's value in exploiting

and stealing Plaintiffs' and Class Members' identities. As a direct and proximate result of Defendant's inadequate data security and breaches of its duties to handle Private Information with reasonable care, Plaintiffs' and Class Members' Private Information was accessed by cybercriminals and exposed to an untold number of unauthorized individuals. Plaintiffs' and Class Members' Private Information has already been misused due to the Data Breach, and the present and continuing risk to Plaintiffs and Class Members as victims of the Data Breach will remain for their respective lifetimes.

14. As a result of the Data Breach, Plaintiffs and Class Members, suffered concrete injuries in fact including, but not limited to (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) actual identity theft and fraud; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of their Private Information; (g) loss of privacy; (h) emotional distress including anxiety and stress; and (i) the continued risk to their sensitive Private Information, which remains in Defendant's possession and subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect it.

15. To recover for these harms, Plaintiffs, on behalf of themselves and the Class as defined herein, bring claims for negligence/negligence *per se*, breach of third-party beneficiary contract, breach of implied contract, and unjust enrichment to address Defendant's inadequate safeguarding of Plaintiffs' and Class Members' Private Information in Defendant's care and the host of injuries that resulted.

## II. THE PARTIES

16. Plaintiff Baitul Javid is a citizen and resident of Chicago, Illinois.

17. Plaintiff Benjamin Meredith is a citizen and resident of Cypress, Illinois

18. Plaintiff Robert Murray is a citizen and resident of Naperville, Illinois.

19. Plaintiff Tina Parsley Hughes is a citizen and resident of Blue Springs, Missouri.

20. Defendant is incorporated under New York law with its principal place of business located at 744 Primera Blvd, Suite 2000, Lake Mary, Florida, 32746. Defendant's registered agent is CT Corporation System, located at 1200 South Pine Island Road, Plantation, Florida, 33324.

## JURISDICTION AND VENUE

21. This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of Class Members is more than 100 and

at least one member of the Class, including multiple Plaintiffs, is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332 (d)(2)(A). Defendant has its principal place of business located in this District.

22. This Court has personal jurisdiction over Defendant because Defendant is a Florida citizen and engaged in substantial and not isolated activity in this state.

23. Venue is proper in this Court because Defendant resides in this District and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## III. GENERAL FACTS APPLICABLE TO ALL COUNTS

### A. Defendant Benefitted from Plaintiffs' and Class Members' Private Information and Promised to Protect It.

24. Defendant is a financial software company that offers a broad range of software and services for retail banking, lending, payments, treasury and capital markets, universal banking, and other financial services.

25. As a condition of doing business, Defendant requires its clients to provide their customers' highly sensitive Private Information. In the ordinary course of receiving financial services as consumers, Plaintiffs and Class Members were required to provide their Private Information to Defendant's clients and through those clients, to Defendant.

26. Defendant needed Plaintiffs' and Class Members' Private Information to provide and operate its software and services that are the source of Defendant's revenue, including software licensed for the specific purposes of consumer data management and processing.

27. In its mandatory collection of Plaintiffs' and Class Members' Private Information, Defendant promised to safeguard the sensitive data maintaining its confidentiality, to use the data only for authorized and legitimate purposes, and to delete such information from its systems once there was no longer a need to maintain it.

28. For example, Defendant's Privacy Policy warrants and assures that Defendant will adequately protect consumers' Private Information from unauthorized disclosure to third parties.

29. Further, Defendant's Privacy Policy warrants that Private Information will be disclosed only in the specific enumerated circumstances, which do not include disclosure to cybercriminals in a breach.

30. Thus, Plaintiffs and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its promises and duties to keep such information confidential and protected from unauthorized access.

31. At all relevant times, Defendant knew it was storing and using its networks to store and transmit valuable, sensitive Private Information belonging to Plaintiffs and Class Members, and that as a result, its systems would be attractive targets for cybercriminals.

32. Defendant also knew that any breach of its information technology network and exposure of the data stored therein would result in the increased risk of identity theft and fraud for the individuals whose Private Information was compromised, as well as intrusion into those individuals' highly private financial matters.

33. Indeed, Defendant experienced a prior data breach in March 2020 where consumer PII was stolen through a ransomware attack and thus knew the consequences of failing to protect Plaintiffs' and Class Members' Private Information.

34. By obtaining, using, and benefiting from Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting that Private Information from unauthorized access and disclosure.

35. Defendant had and has a duty to adopt reasonable measures to keep Plaintiffs' and Class Members' Private Information confidential and protected

from involuntary disclosure to third parties, and to audit, monitor, and verify the integrity of its IT networks and processes.

36. Additionally, Defendant had and has obligations created by the FTC Act, 15 U.S.C. § 45, the GLBA Safeguards Rule, common law, contract, industry standards, and representations made to Plaintiffs and Class Members, to keep their Private Information confidential and protected from unauthorized disclosure. Defendant failed to do so, causing the Data Breach.

**B. Defendant Failed to Adequately Safeguard Plaintiffs' and Class Member's Private Information, Causing the Data Breach.**

37. In or around July 2025, Defendant began sending Plaintiffs and other Data Breach victims correspondence informing them of the Data Breach ("Notice Letters").

38. The Notice Letters generally inform as follows, in part:

> Finastra, which provides financial software solutions to large financial institutions, recently identified and addressed a cybersecurity incident that involved some of your personal information. . . .
>
> ***What Happened?*** On November 7, 2024, Finastra identified a cybersecurity incident that impacted certain Finastra systems. Once the incident was discovered, Finastra immediately launched an investigation, and leading cybersecurity firms were engaged to assist. . . . The investigation revealed that an unauthorized third party accessed a Secure File Transfer Platform (SFTP) at various times between October 31, 2024 and November 8, 2024. Finastra uses this SFTP to provide technical and customer support to its customers related to certain

> Finastra products. Findings from the investigation indicate that on October 31, 2024, the unauthorized third party obtained certain files from the SFTP. . . .

39. Omitted from the Notice Letters were the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiffs and Class Members, who retain a vested interest in ensuring that their Private Information is protected.

40. Thus, Defendant's purported disclosure amounts to no real disclosure at all, as it fails to inform Plaintiffs and Class Members of the Data Breach's critical facts with any degree of specificity. Without these details, Plaintiffs' and Class Members' abilities to mitigate the harms resulting from the Data Breach are severely diminished.

41. To make matters worse, Defendant waited ***8 months*** after discovering the Data Breach to notify Plaintiffs and Class Members their Private Information was involved, further diminishing their abilities to mitigate the harms resulting from the Data Breach.

42. Moreover, while the Notice Letters claim Defendant "has no indication the unauthorized third party further copied, retained, or shared any of the data" involved in the Data Breach, Plaintiffs' investigation proves the opposite: Shortly after the Data Breach, the criminal threat actor known as "abyss0" posted

Private Information stolen from Defendant's systems in the Data Breach for sale on the dark web.

43. As shown in the below screenshot, the abyss0 threat actor claimed it stole 400 GB of data from Defendant's systems in the Data Breach, and offered sample data for download, including files containing Plaintiffs' and Class Members' Private Information. This confirms Private Information was in fact exfiltrated, disclosed, and misused due to the Data Breach.




44. The abyss0 post offering the compromised Private Information for sale was quickly removed, indicating either that the data was sold or held for ransom that Defendant paid.

45. Additionally, samples of Private Information taken in the Data Breach have been circulated within dark web communities.

46. Plaintiffs' investigation further revealed the threat actor behind the Data Breach gained initial access to Defendant's systems using compromised login credentials, a rudimentary technique that any reasonable company in Defendant's position should know to guard against.

47. Plaintiffs' and Class Members' Private Information was targeted, accessed, stolen, and sold on the dark web and/or held for ransom by cybercriminals through the Data Breach. Criminal hackers accessed and acquired confidential files containing Plaintiffs' and Class Members' Private Information from Defendant's network systems, where they were kept without adequate safeguards and in unencrypted form. These hackers targeted and obtained Plaintiffs' and Class Members' Private Information from Defendant's systems because of the data's value in exploiting and stealing Plaintiffs' and Class Members' identities.

48. Defendant should have ensured legacy login credentials were not reused across enterprise systems but failed to do so. Had Defendant required different login credentials for each system, the abyss0 threat actor would not have been able to gain initial access to Defendant's systems to carry out the Data Breach.

49. As the Data Breach evidences, Defendant did not use reasonable security measures appropriate to the nature of the sensitive Private Information it collected and maintained, such as encrypting the information or deleting it when it is no longer needed. These failures allowed and caused cybercriminals to target Plaintiffs' and Class Members' Private Information on Defendant's systems and carry out the Data Breach.

50. Defendant could have prevented this Data Breach by ensuring its files and servers containing Plaintiffs' and Class Members' Private Information were properly secured, sanitized, and encrypted, but failed to do so.

51. Defendant's tortious conduct and breach of contractual obligations are further evidenced by its failure to recognize the Data Breach until cybercriminals had already breached Defendant's systems and accessed it for a week, meaning Defendant had no effective means in place to ensure ongoing cyberattacks were detected.

52. Defendant's negligence in failing to safeguard Plaintiffs' and Class Members' Private Information is exacerbated by the repeated warnings and alerts regarding the need to protect and secure sensitive data.

### C. Defendant Knew the Risk of a Cyberattack because Financial Institutions Storing Private Information are Particularly Suspectable.

53. Data security breaches have dominated the headlines for the last two decades. And it doesn't take an IT industry expert to know it. The general public

can tell you the names of some of the biggest cybersecurity breaches: Target, Yahoo, Marriott International, Chipotle, Chili's, Arby's, and others.

54. Defendant should certainly have been aware, and indeed was aware, that it was at risk for a data breach that could expose the Private Information that it collected and maintained.

55. Defendant was also on notice of the importance of data encryption of Private Information. Defendant knew it kept Private Information in its systems and yet it appears Defendant did not encrypt these systems or the information contained within them.

56. Private Information of the kind accessed in the Data Breach is of great value to cybercriminals as it can be used for a variety of unlawful and nefarious purposes, including ransomware, fraudulent misuse, and sale on the internet black market known as the dark web.

57. Data thieves regularly target businesses in the financial services industry like Defendant due to the highly sensitive information that such entities maintain. Defendant knew and understood that unprotected Private Information is highly sought after by criminals who seek to illegally monetize it through unauthorized access.

58. Cyber-attacks against businesses that collect PII are targeted and frequent. In light of past high profile data breaches at industry-leading companies,

Defendant knew or, if acting as reasonable business handling PII and PHI, should have known, that the Private Information it collected and maintained would be vulnerable to and targeted by cybercriminals.

59. The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant itself. According to IBM's 2022 report, "[f]or 83% of companies, it's not if a data breach will happen, but when."[1]

60. As a financial services company in possession of consumers' Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiffs and Class Members and of the foreseeable consequences if its systems were breached. Such consequences include the significant costs imposed on Plaintiffs and Class Members due to their Private Information's wrongful disclosure.

61. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on its systems, amounting to tens of thousands of individuals' detailed Private Information, and, thus, that these individuals would be harmed by the unauthorized disclosure of that unencrypted data.

---

[1] IBM, "Cost of a data breach 2022: A million-dollar race to detect and respond," available at https://www.ibm.com/reports/data-breach (last accessed Feb. 9, 2024).

62. Plaintiffs and Class Members were the foreseeable and probable victims of Defendant's inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing Private Information and the critical importance of providing adequate security for that information.

63. Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiffs and Class Members from being compromised.

**D. Defendant Was Required But Failed to Comply with FTC Rules and Guidance.**

64. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

65. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which establishes cyber-security guidelines for businesses like Defendant. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

66. The FTC's guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

67. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

68. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect confidential PII/PHI, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures business like Defendant must undertake to meet their data security obligations.

69. Such FTC enforcement actions include actions against entities in the healthcare industry like Defendant. See, e.g., In the Matter of LabMD, Inc., 2016-2

Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

70. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duties in this regard.

71. The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."

72. Defendant failed to properly implement basic data security practices, in violation of its duties under the FTC Act.

73. Defendant's failures to employ reasonable and appropriate means to protect against unauthorized access to Plaintiffs' and Class Members' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by the FTC Act.

74. Additionally, Defendant is a financial institution for purposes of the Gramm–Leach–Bliley Act, 15 U.S.C. § 6801 ("GLBA"), because it is "significantly engaged in financial activities, or significantly engaged in activities incidental to such financial activities." 16 C.F.R. § 314.2(h).

75. "Nonpublic personal information" means "personally identifiable financial information provided by a consumer to a financial institution; resulting from any transaction with the consumer or any service performed for the consumer; or otherwise obtained by the financial institution." 15 U.S.C. § 6809(4)(A)(i)–(iii).

76. The PII involved in the Data Breach constitutes "nonpublic personal information" for purposes of the GLBA.

77. Defendant collects "nonpublic personal information," as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) & 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period, Defendant was subject to the requirements of the GLBA, 15 U.S.C. §§ 6801, *et seq*., and to numerous rules and regulations promulgated under the GLBA.

78. The FTC's Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable

administrative, technical, and physical safeguards, including: (i) designating one or more employees to coordinate the information security program; (ii) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to control those risks; (iii) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (iv) overseeing service providers and requiring them by contract to protect the security and confidentiality of customer information; and (v) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 & 314.4. As alleged herein, Defendant violated the Safeguards Rule.

79. Defendant's conduct resulted in a variety of failures to follow the Safeguards Rule's requirements, many of which are also industry standard. Among such deficient practices, the Data Breach demonstrates that Defendant failed to implement (or inadequately implemented) information security policies or procedures such as effective employee training, adequate intrusion detection systems, regular reviews of audit logs and records, and other similar measures to

protect the confidentiality of the PII it maintained in its information technology systems.

80. Had Defendant implemented data security protocols, the consequences of the Data Breach could have been avoided, or at least significantly reduced as the Data Breach could have been detected earlier, the amount of PII compromised could have been greatly reduced.

**E. Defendant Failed to Comply with Industry Standards.**

81. A number of industry and national best practices have been published and are widely used as a go-to resource when developing an institution's cybersecurity standards.

82. The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training,

Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.

83. In addition, the NIST recommends certain practices to safeguard systems, infra, such as the following:

a. Control who logs on to your network and uses your computers and other devices.

b. Use security software to protect data.

c. Encrypt sensitive data, at rest and in transit.

d. Conduct regular backups of data.

e. Update security software regularly, automating those updates if possible.

f. Have formal policies for safely disposing of electronic files and old devices; and

g. Train everyone who uses your computers, devices, and network about cybersecurity.

84. Further still, the Cybersecurity & Infrastructure Security Agency makes specific recommendations to organizations to guard against cyberattacks, including (a) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date,

prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (b) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior, [e]nabl[ing] logging in order to better investigate issues or events[,] and [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated"; (c) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and; (d) other steps.

85. Upon information and belief, Defendant failed to implement industry standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, as well as failing to comply with other industry standards for protecting Plaintiffs' and Class Members' Private Information, resulting in the Data Breach.

### F. Defendant Owed Plaintiffs and Class Members Common Law Duties to Safeguard their Private Information.

86. In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. This duty obligated Defendant to provide reasonable data security consistent with industry standards and requirements to protect Plaintiffs' and Class Members' Private Information in its care from unauthorized disclosure.

87. Defendant owed duties to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training employees and others who accessed Private Information on how to adequately protect it.

88. Defendant owed duties to Plaintiffs and Class Members to implement processes that would promptly detect unauthorized access to Private Information.

89. Defendant owed duties to Plaintiffs and Class Members to act upon data security warnings and alerts in a timely fashion.

90. Defendant owed duties to Plaintiffs and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

91. Defendant owed these duties to Plaintiffs and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

92. Defendant failed to take the necessary precautions to safeguard and protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure. Defendant's actions and omissions represent a flagrant disregard of Plaintiffs' and Class Members' rights.

### G. Plaintiffs and Class Members Suffered Common Injuries and Damages due to Defendant's Conduct.

93. Defendant's failure to implement or maintain adequate data security measures for Plaintiffs' and Class Members' Private Information directly injured them by the resulting disclosure of their Private Information in the Data Breach.

94. The ramifications of Defendant's failures to keep Plaintiffs' and Class Members' Private Information secure are long lasting and severe. Once Private Information is stolen fraudulent use of that information and damage to victims may continue for years.

95. Plaintiffs and Class Members are also at a continued risk because their Private Information remains in Defendant's systems, which have already been shown to be susceptible to compromise and are subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect its customers' privacy.

96. As a result of Defendant's ineffective and inadequate data security practices, the consequential Data Breach, and the foreseeable outcome of Plaintiffs' and Class Members' Private Information ending up in criminals' hands, Plaintiffs and Class Members have suffered and will continue to suffer the following injuries and damages, without limitation: (a) actual identity theft, fraud and misuse of Private Information; (b) financial costs and lost time attending to actual identity theft, fraud, and misuse; (c) an imminent, increased risk of future identity theft; (d) lost time and costs mitigating the increased risk of identity theft; (e) invasion of privacy; (f) deprivation of value of Private Information; (g) lost benefit of their bargains with Defendant; (h) emotional distress including stress and anxiety; and (i) the continued risk to their sensitive Private Information, which remains in Defendant's possession and subject to further unauthorized disclosures so long as Defendant fails to take appropriate and adequate measures to protect it.

***Present and Ongoing Risk of Identity Theft***

97. Plaintiffs and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

98. Upon information and belief, Plaintiffs' and the Class Members' Private Information has already been sold on the dark web. Indeed, Plaintiff Edwards began receiving notifications in early 2025 – just a few short weeks after the Data Breach – that her Private Information was found on the dark web.

99. The link between a data breach and identity theft is simple and well established. Criminals acquire and steal Private Information to monetize it. Criminals monetize the data by selling the stolen information on the dark web internet black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

100. The dark web is an unindexed layer of the internet that requires special software or authentication to access. Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's URL is cia.gov, but on the dark web it is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion. This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

101. A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, PHI and PII like the Private Information at issue here. The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a

physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information. As Microsoft warns, "The anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[2]

102. The unencrypted Private Information of Plaintiffs and Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. And on information and belief, at least some of the Private Information stolen in the Data Breach has already been published on the dark web. Unauthorized actors can easily access and misuse Plaintiffs' and Class Members' Private Information due to the Data Breach.

103. Private Information can also be used to distinguish, identify, or trace an individual's identity, such as their name, Social Security number, and financial records. This may be accomplished alone, or in combination with other personal or identifying information that is connected or linked to an individual, like his or her birthdate, birthplace, or mother's maiden name.

104. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person,

---

[2] *What is the dark web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

105. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

106. One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[3]

---

[3] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014),

107. With Fullz packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

108. The development of Fullz packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

109. The development of Fullz packages means that stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court

---

https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm (last visited Feb. 26, 2024).

or a jury, to find that their stolen Private Information is being misused, and that such misuse is traceable to the Data Breach.

110. Social Security are among the worst kind of personal information to have stolen because they may be put to numerous serious fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[4]

111. What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

---

[4] Social Security Administration, *Identity Theft and Your Social Security Number*, available at: https://www.ssa.gov/pubs/EN-05-10064.pdf.

112. Even then, new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[5]

113. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for credit lines.

114. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice,

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or

[5] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Aug. 23, 2024).

> personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[6]

115. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.

116. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

117. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come.

***Lost Time Mitigating the Risk of Identify Theft and Fraud***

---

[6] Erika Harrell, *Bureau of Just. Stat.*, U.S. DEP'T OF JUST., NCJ 256085, *Victims of Identity Theft*, 2018 I (2020) https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last accessed Jan. 23, 2024).

118. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, victims must spend a considerable amount of time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

119. As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the asset of time has been lost.

120. Plaintiffs' and Class Members' time is highly valuable and irreplaceable, and accordingly, Plaintiffs and Class Members suffered actual injury and damages in the form of lost time that they spent on mitigation activities in response to the Data Breach and at the direction of Defendant's Notice Letter.

121. Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must monitor their financial accounts for many years to mitigate that harm.

122. Plaintiffs and Class Members have spent time, and will spend additional time in the future, on a variety of prudent actions, such as placing freezes and alerts with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover.

123. These efforts are consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.

124. Once Private Information is exposed, there is virtually no way to ensure it has been fully recovered or contained against future misuse. Plaintiffs and Class Members will thus need to maintain these heightened measures for

years, and possibly their entire lives, as a result of Defendant's conduct and consequential Data Breach.

*Diminished Value of Private Information*

125. Private Information is a valuable property right. Its value is axiomatic, considering the value of Big Data in corporate America, and consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable value.

126. For example, drug and medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase Private Information on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

127. Private Information can sell for as much as $363 per record.

128. Medical information is especially valuable to identity thieves. According to account monitoring company LogDog, medical data sells on the dark web for $50 and up.

129. An active and robust legitimate market for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-

public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.

130. As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been diminished in its value by its unauthorized and likely release onto the dark web, where it holds significant value for the threat actors.

131. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

***Reasonable and Necessary Future Cost of Credit Monitoring***

132. Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information, and the *modus operandi* of cybercriminals, it is no surprise that entire batches of stolen Private Information have been placed on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes like opening bank accounts in the victims' names to make purchases or to launder

money, filing false tax returns, taking out loans or lines of credit, or filing false unemployment claims.

133. Such fraud may go undetected until debt collection calls commence months, or even years later. An individual may not know that her or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

134. Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts. The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

135. Consequently, Plaintiffs and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future, if not forever, and must spend money on reasonable mitigation measures to mitigate that risk.

136. The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost

to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

## IV. PLAINTIFFS' EXPERIENCES AND INJURIES

***Baitul Javid's Experience***

137. Plaintiff Baitul Javid (for the purposes of this section" Plaintiff") is an adult individual who at all relevant times has been a citizen and resident of Illinois.

138. Plaintiff is a customer of a financial institution that outsources information to Finastra and her information was stored with and handled by Defendant as a result of her dealings with her financial institution.

139. As a customer of her financial institution, she was required to provide her Private Information which was subsequently provided to Defendant, including among other things, her full name, address, Social Security number, date of birth, financial account information.

140. On or about June 30, 2025, Plaintiff received a Notice Letter from Defendant, informing her that her Private Information was improperly accessed and obtained by unauthorized third parties during the Data Breach, including her Social Security number, date of birth, financial account number[7].

[7] Plaintiff Javid's Notice Letter is attached hereto as Exhibit A.

141. Plaintiff greatly values her privacy and is very careful about sharing her sensitive Private Information. Plaintiff diligently protects her Private Information and stores any documents containing Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

142. Plaintiff is concerned that her Private Information has now been exposed to bad actors. As a result, she has taken multiple steps to avoid identity theft, including increasingly reviewing her credit monitoring service, setting up notices and reports and carefully reviewing all her accounts. Plaintiff has also made a free Credit Karma account to perform a credit freeze to prevent unauthorized individuals from abusing her Private Information. The freeze restricts access to her credit file. Plaintiff did this as a result of the Notice Letters instructions regarding security freezes. Plaintiff also downloaded the Kanary Copilot app to help monitor her Private Information. The app performs a scan and prompts her to send an email requesting that her Private Information is removed from certain websites. The app provides her with templates for opt out emails when the app finds her Private Information on other sites. This is another free application she downloaded and has utilized in response to the Data Breach.

143. As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching

the Data Breach, and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff monitors her Private Information multiple times a week and has already spent many hours dealing with the Data Breach, valuable time Plaintiff otherwise would have spent on other activities.

144. Plaintiff suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of Private Information, a form of property that Defendant obtained from Plaintiff; (b) violation of privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud. Upon information and belief, as a result of the Data Breach, Plaintiff has experienced increased amounts of spam email, texts and phones calls.

145. Plaintiff has additionally suffered actual injury in that Plaintiff received a telephone call from one of her credit card companies advising her that there was fraudulent activity on her credit card. As a result, she cancelled the card and was issued a new card. Upon information and believe these occurrences were as a direct result of the Data Breach.

146. Plaintiff has additionally suffered actual injury in that she has received several notifications of unauthorized attempts to log in to various

accounts including her Facebook account and gaming accounts. Upon information and belief this is a direct result of the Data Breach.

147. Plaintiff has experienced a substantial increase in spam telephone calls, emails and texts which upon information and belief are a direct result of the Data Breach.

148. Furthermore, Plaintiff has been caused significant worry and feelings of anxiety and emotional distress regarding the disclosure of his Private Information in the Data Breach.

149. As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

150. Plaintiff greatly values her privacy, and would not have provided her Private Information, undertaken the services and paid the amounts that she did if she had known that her Private Information would be maintained using inadequate data security systems.

***Benjamin Meredith's Experience***

151. Plaintiff Benjamin Meredith (for the purposes of this section" Plaintiff") is an adult individual who at all relevant times has been a citizen and resident of Illinois.

152. Plaintiff is a customer of a financial institution/credit card company that outsources information to Finastra and his information was stored with and handled by Defendant as a result of his dealings with his financial institution/credit card company.

153. As a customer of his financial institution/credit card company, he was required to provide his Private Information which was subsequently provided to Defendant, including among other things, his full name, address, Social Security number, date of birth, financial account information.

154. On or about June 30, 2025, Plaintiff received a Notice Letter from Defendant, informing him that his Private Information was improperly accessed and obtained by unauthorized third parties during the Data Breach, including his Social Security number, date of birth, and financial account number.

155. Plaintiff greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff diligently protects his Private Information and stores any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

156. Plaintiff is concerned that his Private Information has now been exposed to bad actors. As a result, he has taken multiple steps to avoid identity theft, including increasingly reviewing his credit monitoring service, setting up notices and reports and carefully reviewing all his accounts. Plaintiff has also made a free My ID Care account which provides credit monitoring services.

157. As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff monitors his Private Information multiple times a week and has already spent many hours dealing with the Data Breach, valuable time Plaintiff otherwise would have spent on other activities.

158. Plaintiff suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of Private Information, a form of property that Defendant obtained from Plaintiff; (b) violation of privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud. Upon information and belief, as a result of the Data Breach, Plaintiff has experienced increased amounts of spam email, texts and phones calls.

159. Plaintiff has additionally suffered actual injury in that shortly after the Data Breach Plaintiff learned that an unauthorized third party filed a fraudulent tax return. Upon information and believe this occurrence was as a direct result of the Data Breach.

160. Furthermore, Plaintiff has been caused significant worry and feelings of anxiety and emotional distress regarding the disclosure of his Private Information in the Data Breach.

161. As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

162. Plaintiff greatly values his privacy, and would not have provided his Private Information, undertaken the services and paid the amounts that he did if he had known that his Private Information would be maintained using inadequate data security systems.

***Robert Murray Experience***

163. Plaintiff Robert Murray (for the purposes of this section" Plaintiff") is an adult individual who at all relevant times has been a citizen and resident of Illinois.

164. Plaintiff is a customer of a financial institution that outsources information to Finastra and his information was stored with and handled by Defendant as a result of his dealings with his financial institution/credit card company.

165. As a customer of his financial institution, he was required to provide his Private Information which was subsequently provided to Defendant, including among other things, his full name, address, Social Security number, date of birth, financial account information.

166. On or about June 30, 2025, Plaintiff received a Notice Letter from Defendant, informing him that his Private Information was improperly accessed and obtained by unauthorized third parties during the Data Breach, including his Social Security number and date of birth[8].

167. Plaintiff greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff diligently protects his Private Information and stores any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

168. Plaintiff is concerned that his Private Information has now been exposed to bad actors. As a result, he has taken multiple steps to avoid identity

[8] Plaintiff Murray's Notice Letter is attached hereto as Exhibit B.

theft, including increasingly reviewing his credit monitoring service, setting up notices and reports and carefully reviewing all his accounts. Plaintiff has LifeLock credit monitoring for which he pays $65.00 annually. Additionally, Plaintiff has paid to place a freeze on his credit as a result of the Data Breach.

169. As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff monitors his Private Information multiple times a week and has already spent many hours dealing with the Data Breach, valuable time Plaintiff otherwise would have spent on other activities.

170. Plaintiff suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of Private Information, a form of property that Defendant obtained from Plaintiff; (b) violation of privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud. Upon information and belief, as a result of the Data Breach, Plaintiff has experienced increased amounts of spam email, texts and phones calls.

171. Plaintiff has additionally suffered actual injury in that shortly after the Data Breach Plaintiff searched and found hacker activity on his computer

through a free online service. Upon information and believe this occurrence was as a direct result of the Data Breach.

172. Plaintiff has additionally suffered actual injury in that he received a phone call from Verizon on or about July 15, 2025, attempting to activate a new phone on his account based on a request from an unauthorized third party who had Plaintiff's personal information. As a result, his phone was then temporarily disconnected. Plaintiff spent many hours on the phone with Verizon customer service attempting to rectify the situation.

173. Furthermore, Plaintiff has been caused significant worry and feelings of anxiety and emotional distress regarding the disclosure of his Private Information in the Data Breach. Upon information and believe this occurrence was as a direct result of the Data Breach.

174. As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

175. Plaintiff greatly values his privacy, and would not have provided his Private Information, undertaken the services and paid the amounts that he did if

he had known that his Private Information would be maintained using inadequate data security systems.

***<u>Tina Parsley Hughes' Experience</u>***

176. Plaintiff Tina Parsley Hughes' (for the purposes of this section" Plaintiff") is an adult individual who at all relevant times has been a citizen and resident of Missouri.

177. Plaintiff is a customer of a financial institution that outsources information to Finastra and her information was stored with and handled by Defendant as a result of her dealings with her financial institution.

178. As a customer of her financial institution, she was required to provide her Private Information which was subsequently provided to Defendant, including among other things, her full name, address, Social Security number, date of birth, financial account information.

179. On or about June 30, 2025, Plaintiff received a Notice Letter from Defendant, informing her that her Private Information was improperly accessed and obtained by unauthorized third parties during the Data Breach, including her Social Security number and date of birth[9].

180. Plaintiff greatly values her privacy and is very careful about sharing her sensitive Private Information. Plaintiff diligently protects her Private

[9] Plaintiff Hughes's Notice Letter is attached hereto as Exhibit C.

Information and stores any documents containing Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

181. Plaintiff is concerned that her Private Information has now been exposed to bad actors. As a result, she has taken multiple steps to avoid identity theft, including increasingly reviewing her credit monitoring service, setting up notices and reports and carefully reviewing all her accounts. Plaintiff has also purchased LifeLock full protection for business for which she pays a monthly fee.

182. As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff is concerned about her personal accounts as well as her business accounts. Plaintiff monitors her Private Information multiple times a week and has already spent many hours dealing with the Data Breach, valuable time Plaintiff otherwise would have spent on other activities.

183. Plaintiff suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of Private Information, a form of property that Defendant obtained from Plaintiff; (b) violation of privacy rights; and (c)

present, imminent and impending injury arising from the increased risk of identity theft and fraud. Upon information and belief, as a result of the Data Breach, Plaintiff has experienced increased amounts of spam email, texts and phones calls.

184. Plaintiff has additionally suffered actual injury in that has dealt with multiple unauthorized attempts to file loans in her name as well as in the name of her business. Upon information and believe these occurrences were as a direct result of the Data Breach.

185. Since the Data Breach, Plaintiff was informed that her Private Information was found on the Dark Web, a notice that she has never before received.

186. Plaintiff has suffered several fraud and identity theft events since the Data Breach. She has had money taken from her personal and business accounts. Plaintiff has spent hours working with her financial institutions to rectify the thefts and fraud and is still dealing with the ongoing issues effecting her business as well as her personally.

187. Plaintiff has experienced a substantial increase in spam telephone calls, emails and texts which upon information and belief are a direct result of the Data Breach.

188. Furthermore, Plaintiff has been caused significant worry and feelings of anxiety and emotional distress regarding the disclosure of his Private Information in the Data Breach.

189. As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

190. Plaintiff greatly values her privacy, and would not have provided her Private Information, undertaken the services and paid the amounts that she did if she had known that her Private Information would be maintained using inadequate data security systems.

## V. CLASS ACTION ALLEGATIONS

191. Plaintiffs bring all claims as class claims under Federal Rule of Civil Procedure 23(a), (b)(3), and (c)(4).

192. The class Plaintiffs seek to represent is defined as follows:

> All individuals in the United States whose Private Information may have been compromised in Defendant's Data Breach, including all such individuals who received a Notice Letter (the "Class").

193. Plaintiffs reserve the right to amend the above definition or to propose subclasses in subsequent pleadings and motions for class certification.

194. **Numerosity:** The proposed Class is believed to be so numerous that joinder of all members is impracticable. Upon information and belief, the Class is comprised of thousands of members.

195. **Typicality:** Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and all members of the Class were injured through Defendant's uniform misconduct. The same event and conduct that gave rise to Plaintiffs claims are identical to those that give rise to the claims of every other Class member because Plaintiffs and each member of the Class had their sensitive Private Information compromised in the same way by the same conduct of Defendant.

196. **Adequacy:** Plaintiffs are adequate representatives of the Class because Plaintiffs interests do not conflict with the interests of the Class that Plaintiffs seek to represent; Plaintiffs have retained counsel competent and highly experienced in data breach class action litigation; and Plaintiffs' and Plaintiffs' counsel intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and Plaintiffs' counsel.

197. **Superiority:** A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult, if not impossible, for members of the Class

individually to effectively redress Defendant's wrongdoing. Even if Class members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

198. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

a. Whether Defendant engaged in the wrongful conduct alleged herein;

b. Whether Defendant failed to adequately safeguard Plaintiffs' and the Class's Private Information;

c. Whether Defendant's email and computer systems and data security practices used to protect Plaintiffs' and Class Members' Private Information violated the FTC Act, and/or state laws and/or Defendant's other duties discussed herein;

d. Whether Defendant owed a duty to Plaintiffs and the Class to adequately protect their Private Information, and whether it breached this duty;

e. Whether Defendant knew or should have known that its computer and network security systems and business email accounts were vulnerable to a data breach;

f. Whether Defendant's conduct, including its failure to act, resulted in or was the proximate cause of the Data Breach;

g. Whether Defendant breached contractual duties owed to Plaintiffs and the Class to use reasonable care in protecting their Private Information;

h. Whether Defendant failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiffs and the Class;

i. Whether Defendant continues to breach duties to Plaintiffs and the Class;

j. Whether Plaintiffs and the Class suffered injury as a proximate result of Defendant's negligent actions or failures to act;

k. Whether Plaintiffs and the Class are entitled to recover damages, equitable relief, and other relief;

l. Whether injunctive relief is appropriate and, if so, what injunctive relief is necessary to redress the imminent and currently ongoing harm faced by Plaintiffs and members of the Class and the general public;

m. Whether Defendant's actions alleged herein constitute gross negligence; and

n. Whether Plaintiffs and Class members are entitled to punitive damages.

## VI. CAUSES OF ACTION

### COUNT ONE
### NEGLIGENCE/NEGLIGENCE *PER SE*
### (On Behalf of Plaintiffs and the Nationwide Class)

199. Plaintiffs incorporate by reference all allegations contained in paragraphs 1-198, as though fully set forth herein.

200. Defendant solicited, gathered, and stored the Private Information of Plaintiffs and the Class as part of the operation of its business and in order to gain profit.

201. Upon accepting and storing the Private Information of Plaintiffs and Class Members, Defendant undertook and owed a duty to Plaintiffs and Class

members to exercise reasonable care to secure and safeguard that information and to use secure methods to do so.

202. Defendant had full knowledge of the sensitivity of the Private Information, the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information was wrongfully disclosed, and the importance of adequate security.

203. Plaintiffs and Class Members were the foreseeable victims of any inadequate safety and security practices on the part of Defendant. Plaintiffs and the Class Members had no ability to protect their Private Information that was in Defendant's possession. As such, a special relationship existed between Defendant and Plaintiffs and the Class.

204. Defendant was well aware of the fact that cyber criminals routinely target companies through cyberattacks in an attempt to steal sensitive personal information.

205. Defendant owed Plaintiffs and the Class Members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiffs and the Class when obtaining, storing, using, and managing personal information, including taking action to reasonably safeguard such data and providing notification to Plaintiffs and the Class Members of any breach in a timely manner so that appropriate action could be taken to minimize losses.

206. Defendant's duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures also have recognized the existence of a specific duty to reasonably safeguard personal information.

207. Defendant had duties to protect and safeguard the Private Information of Plaintiffs and the Class from being vulnerable to cyberattacks by taking common-sense precautions when dealing with sensitive Private Information. Additional duties that Defendant owed Plaintiffs and the Class include:

a. To exercise reasonable care in designing, implementing, maintaining, monitoring, and testing Defendant's networks, systems, email accounts, protocols, policies, procedures and practices to ensure that Plaintiffs' and Class Members' Private Information was adequately secured from impermissible release, disclosure, and publication;

b. To protect Plaintiffs' and Class Members' Private Information in its possession by using reasonable and adequate security procedures and systems;

c. To implement processes to quickly detect a data breach, security incident, or intrusion involving its business email system, networks and servers; and

d. To promptly notify Plaintiffs and Class Members of any data breach, security incident, or intrusion that affected or may have affected their Private Information.

208. Only Defendant was in a position to ensure that its systems and protocols were sufficient to protect the Private Information that Plaintiffs and the Class had entrusted to it.

209. Defendant breached its duty of care by failing to adequately protect Plaintiffs' and Class Members' Private Information. Defendant breached its duties by, among other things:

a. Failing to exercise reasonable care in obtaining, retaining securing, safeguarding, deleting, and protecting the Private Information in its possession;

b. Failing to protect the Private Information in its possession by using reasonable and adequate security procedures and systems;

c. Failing to adequately and properly audit, test, and train its employees to avoid phishing emails;

d. Failing to use adequate email security systems, including industry standard SPAM filters, DMARC enforcement, and/or Sender Policy Framework enforcement to protect against phishing emails;

e. Failing to adequately and properly audit, test, and train its employees regarding how to properly and securely transmit and store Private Information;

f. Failing to adequately train its employees to not store Private Information longer than absolutely necessary for the specific purpose that it was sent or received;

g. Failing to consistently enforce security policies aimed at protecting Plaintiffs and the Class's Private Information;

h. Failing to implement processes to quickly detect data breaches, security incidents, or intrusions;

i. Failing to promptly notify Plaintiffs and Class Members of the Data Breach that affected their Private Information.

210. Defendant's willful failure to abide by these duties was wrongful, reckless, and grossly negligent in light of the foreseeable risks and known threats.

211. As a proximate and foreseeable result of Defendant's grossly negligent conduct, Plaintiffs and the Class have suffered damages and are at imminent risk of additional harms and damages (as alleged above).

212. Through Defendant's acts and omissions described herein, including but not limited to Defendant's failure to protect the Private Information of Plaintiffs and Class Members from being stolen and misused, Defendant unlawfully breached its duty to use reasonable care to adequately protect and secure the Private Information of Plaintiffs and Class Members while it was within Defendant's possession and control.

213. Further, through its failure to provide timely and clear notification of the Data Breach to Plaintiffs and Class Members, Defendant prevented Plaintiffs and Class Members from taking meaningful, proactive steps toward securing their Private Information and mitigating damages.

214. As a result of the Data Breach, Plaintiffs and Class Members have spent time, effort, and money to mitigate the actual and potential impact of the Data Breach on their lives, including but not limited to, responding to fraudulent

activity, closely monitoring bank account activity, and examining credit reports and statements sent from providers and their insurance companies.

215. Defendant's wrongful actions, inactions, and omissions constituted (and continue to constitute) common law negligence.

216. The damages Plaintiffs and the Class have suffered (as alleged above) and will suffer were and are the direct and proximate result of Defendant's grossly negligent conduct.

217. In addition to its duties under common law, Defendant had additional duties imposed by statute and regulations, including the duties under the FTC Act. The harms which occurred as a result of Defendant's failure to observe these duties, including the loss of privacy, lost time and expense, and significant risk of identity theft are the types of harm that these statutes and regulations intended to prevent.

218. Defendant violated these statutes when it engaged in the actions and omissions alleged herein, and Plaintiffs' and Class Members' injuries were a direct and proximate result of Defendant's violations of these statutes. Plaintiffs therefore is entitled to the evidentiary presumptions for negligence *per se*.

219. Pursuant to the FTC Act, 15 U.S.C. § 45(a), Defendant owed a duty to Plaintiffs and the Class to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiffs and the Class.

220. The FTC Act prohibits "unfair practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also formed part of the basis of Defendant's duty in this regard.

221. Defendant gathered and stored the Private Information of Plaintiffs and the Class as part of its business, which affect commerce.

222. Defendant violated the FTC Act by failing to use reasonable measures to protect the Private Information of Plaintiffs and the Class and by not complying with applicable industry standards, as described herein.

223. Defendant breached its duties to Plaintiffs and the Class under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and/or data security practices to safeguard Plaintiffs' and Class Members' Private Information, and by failing to provide prompt and specific notice without reasonable delay.

224. Plaintiffs and the Class are within the class of persons that the FTC Act was intended to protect.

225. The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against.

226. Defendant breached its duties to Plaintiffs and the Class under these laws by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs and the Class's Private Information.

227. Defendant breached its duties to Plaintiffs and the Class by unreasonably delaying and failing to provide notice of the Data Breach expeditiously and/or as soon as practicable to Plaintiffs and the Class.

228. As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered, and continue to suffer, damages arising from the Data Breach, as alleged above.

229. The injury and harm that Plaintiffs and Class Members suffered (as alleged above) was the direct and proximate result of Defendant's negligence.

230. Plaintiffs and the Class have suffered injury and are entitled to actual and punitive damages in amounts to be proven at trial.

## COUNT TWO
## BREACH OF THIRD-PARTY BENEFICIARY CONTRACT
## (On Behalf of Plaintiffs and the Nationwide Class)

231. Plaintiffs incorporate by reference all allegations contained in paragraphs 1-198, as though fully set forth herein.

232. Upon information and belief, Defendant entered into virtually identical contracts with its clients to provide technology solutions and financial services software, which included data security practices, procedures, and

protocols sufficient to safeguard the Private Information that was to be entrusted to it.

233. Such contracts were made expressly for the benefit of Plaintiffs and the Class, as it was their Private Information that Defendant agreed to receive and protect through its services. Thus, the benefit of collection and protection of the Private Information belonging to Plaintiffs and the Class was the direct and primary objective of the contracting parties, and Plaintiffs and Class Members were direct and express beneficiaries of such contracts.

234. Defendant knew that if they were to breach these contracts with its clients, Plaintiffs and the Class would be harmed.

235. Defendant breached its contracts with its clients and, as a result, Plaintiffs and Class Members were affected by this Data Breach when Defendant failed to use reasonable data security and/or business associate monitoring measures that could have prevented the Data Breach.

236. As foreseen, Plaintiffs and the Class were harmed by Defendant's failure to use reasonable data security measures to securely store and protect the files in its care, including but not limited to, the continuous and substantial risk of harm through the loss of their Private Information.

237. As a direct and proximate result of Defendant's breach of the third-party beneficiary contracts, Plaintiffs and Class Members are entitled to damages,

including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

**COUNT THREE**
**UNJUST ENRICHEMNT**
**(On Behalf of Plaintiffs and the Nationwide Class)**

238. Plaintiffs incorporate by reference all allegations contained in paragraphs 1-198, as though fully set forth herein.

239. Plaintiffs and the Class bring this claim in the alternative to all other claims and remedies at law.

240. Defendant collected, maintained, and stored the Private Information of Plaintiffs and Class Members as part its business operations and to gain profits. As such, Defendant had direct knowledge of the monetary benefits conferred upon it.

241. Defendant, by way of its affirmative actions and omissions, including its knowing violations of its express or implied contracts with the entities that collected Plaintiffs and the Class Members' Private Information, knowingly and deliberately enriched itself by saving the costs it reasonably and contractually should have expended on reasonable data privacy and security measures to secure Plaintiffs' and Class Members' Private Information.

242. Instead of providing a reasonable level of security, training, and protocols that would have prevented the Data Breach, as described above and as

is common industry practice among companies entrusted with similar Private Information, Defendant, upon information and belief, instead consciously and opportunistically calculated to increase its own profits at the expense of Plaintiffs and Class Members.

243. Defendant failed to implement—or adequately implement—data security practices, procedures, and programs to secure sensitive Private Information, including without limitation those industry standard data security practices, procedures, and programs discussed herein.

244. As a direct and proximate result of Defendant's decision to profit rather than provide adequate data security, Plaintiffs and Class Members suffered and continue to suffer actual damages, including (i) the amount of the savings and costs Defendant reasonably and contractually should have expended on data security measures to secure Plaintiffs and Class Members Private Information, (ii) time and expenses mitigating harms, (iii) diminished value of Private Information, (iv) loss of privacy, (v) harms as a result of identity theft; and (vi) an increased risk of future identity theft.

245. Defendant, upon information and belief, has therefore engaged in opportunistic and unethical conduct by profiting from conduct that it knew would create a significant and highly likely risk of substantial and certainly impending harm to Plaintiffs and the Class in direct violation of Plaintiffs' and Class

Members' interests. As such, it would be inequitable, unconscionable, and unlawful to permit Defendant to retain the benefits it derived as a consequence of its wrongful conduct.

246. Accordingly, Plaintiffs and the Class are entitled to relief in the form of restitution and disgorgement of all ill-gotten gains, which should be put into a common fund to be distributed to Plaintiffs and the Class.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray for judgment against Defendant as follows:

a. An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Class requested herein;

b. A judgment in favor of Plaintiffs and the Class awarding them appropriate monetary relief, including actual damages, restitution, attorney fees, expenses, costs, and such other and further relief as is just and proper.

c. An order providing injunctive and other equitable relief as necessary to protect the interests of the Class and the general public as requested herein, including, but not limited to:

i. Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

ii. Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

iii. Ordering that Defendant audit, test, and train its security personnel regarding any new or modified procedures;

iv. Ordering that Defendant segment customer data by, among other things, creating firewalls and access controls so that if one area of Defendant's systems is compromised, hackers cannot gain access to other portions of Defendant's systems;

v. Ordering that Defendant cease transmitting Private Information via unencrypted email;

vi. Ordering that Defendant cease storing Private Information in email accounts;

vii. Ordering that Defendant purge, delete, and destroy in a reasonably secure manner customer data not necessary for its provisions of services;

viii. Ordering that Defendant conduct regular database scanning and securing checks;

ix. Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

x. Ordering Defendant to meaningfully educate its current, former, and prospective employees and subcontractors about the threats faced as a result of the loss of financial and personal information to third parties, as well as the steps they must take to protect against such occurrences;

d. An order requiring Defendant to pay the costs involved in notifying the Class Members about the judgment and administering the claims process;

e. A judgment in favor of Plaintiffs and the Class awarding them pre-judgment and post-judgment interest, reasonable attorneys' fees, costs and expenses as allowable by law; and

f. An award of such other and further relief as this Court may deem just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

DATED: November 13, 2025

*/s/ Mariya Weekes*
Mariya Weekes (FBN 56299)
**MILBERG, PLLC**
333 SE 2nd Avenue, Suite 2000
Miami, FL 33131
Tel: (866) 252-0878
mweekes@milberg.com

Jeff Ostrow (FBN 121452)
**KOPELOWITZ OSTROW P.A**.
One West Las Olas Blvd, Suite 500
Fort Lauderdale, FL 33301
Tel: (954) 525-4100
ostrow@kolawyers.com

*Interim Co-lead Class Counsel for Plaintiffs and the Class*